# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SUPERIOR COMMUNICATIONS,
d/b/a SMILE FM,

                                  Case No. 15-13363

      Plaintiff,                      Hon. Gerald E. Rosen

v.

CITY OF RIVERVIEW,

      Defendant.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on         January 30, 2017

PRESENT:  Honorable Gerald E. Rosen
                  United States District Judge

## I. INTRODUCTION

Plaintiff Superior Communications, doing business as Smile FM,

commenced this suit in state court on or around August 13, 2015, alleging that the

Defendant City of Riverview breached a license agreement executed by the parties

and violated Plaintiff's federal constitutional rights to due process and equal

protection of the law when the Defendant City denied Plaintiff's request to

upgrade radio broadcast equipment installed on a telecommunications tower

owned by the City.  Defendant removed the case to this Court on September 24, 2015, citing Plaintiff's assertion of federal claims under 42 U.S.C. § 1983.  *See* 28 U.S.C. §§ 1441(a), 1331.  Following this removal, Plaintiff amended its complaint to assert an additional claim under the federal Telecommunications Act ("TCA"), 47 U.S.C. § 151 *et seq.*

Through the present motion filed on June 10, 2016, Defendant seeks an award of summary judgment in its favor as to Plaintiff's federal and state-law claims.  Regarding Plaintiff's state-law claim that Defendant breached the parties' license agreement, Defendant contends that this claim is defeated by express language in the agreement that precludes Plaintiff from upgrading its broadcast equipment in a manner that would increase the number, size, or power output of Plaintiff's existing antenna facilities.  Next, Defendant argues that Plaintiff has no private right of action under the TCA arising from any alleged violation of the implementing regulations issued by the Federal Communications Commission ("FCC"), and that Defendant did not violate these regulations in any event. Finally, Defendant contends that the terms of the parties' license agreement preclude Plaintiff from establishing any property interest that could support a federal due process claim, and that Plaintiff's equal protection claim fails for lack of evidence that Plaintiff was treated differently from any other, similarly situated

2

tenant that has installed equipment on Defendant's telecommunications tower.[1]

Defendant's summary judgment motion has been fully briefed by the parties.  Having thoroughly reviewed the parties' briefs in support of and in opposition to Defendant's motion, as well as the exhibits accompanying these briefs, the Court finds that the relevant facts, legal issues, and authorities are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process.  Accordingly, the Court will decide Defendant's motion "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets forth the Court's rulings on this motion.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Parties

Plaintiff Superior Communications, doing business as Smile FM, is a Michigan non-profit corporation that operates 21 radio broadcast stations in the State of Michigan.  At all relevant times, the Defendant City of Riverview has owned a telecommunications tower located on Grange Road in Riverview,

---

[1]Defendant also argues in its motion that Plaintiff is not entitled to the award of punitive damages sought in its complaint.  In response, Plaintiff states that it conceded this point when Defendant sought concurrence in its motion.  Thus, this issue has been resolved and the Court need not address it further.

Michigan.

## B.      The Pertinent Terms of the Parties' License Agreement

In December of 2007, Plaintiff applied to the FCC for a permit to operate a low-powered FM radio broadcast station with equipment mounted on Defendant's Grange Road tower, and the FCC ultimately issued this permit on February 1, 2010.[2]  On October 20, 2010, Plaintiff entered into a "Telecommunication Site Access License Agreement" (the "License Agreement") with Defendant that allowed Plaintiff to locate and operate its radio broadcasting equipment on the

---

[2]In the very first sentence of its brief in response to Defendant's summary judgment motion, Plaintiff chides Defendant for referring to the broadcast facility approved by the FCC as "low power," asserting that this characterization "demonstrat[es] that [the Defendant City] does not understand the technical aspects of radio broadcasting."  (Plaintiff's Response Br. at 1.)  Defendant can perhaps be forgiven for this description, however, considering that Plaintiff itself states in its complaint that the approval granted by the FCC "was to operate a 700 Watt channel of effective radiated power, which is considered **low-powered** and of limited reception range."  (Amended Complaint at ¶ 8 (emphasis added).)

Regrettably, this inauspicious beginning to Plaintiff's response brief is indicative of the lengths to which the parties and their counsel are willing to go in their briefing to squabble over immaterial matters.  Defendant, for example, suggests early in its initial brief that Plaintiff acted contrary to "FCC rules[] and practice in the industry" by applying for FCC approval without first securing the Defendant City's permission to locate its broadcasting equipment on the City's telecommunications tower.  (Defendant's Motion, Br. in Support at 2.)  This, in turn, devolves into a dispute over the precise date when Defendant acquired ownership of the tower.  Yet, neither of these matters has any bearing whatsoever on the disposition of Defendant's motion, and neither party contends otherwise in its briefing.  Such petty quarrels are unbecoming of the experienced counsel representing the parties in this case.

City's tower.  (*See* Defendant's Motion, Ex. 1, License Agreement.)

The License Agreement had an initial term of one year, but allowed for renewal for up to seven additional one-year terms.  (*See id.* at ¶ 3(a).)  Plaintiff agreed to pay $550 per month in rent to Defendant for its use of the tower to operate its broadcast equipment.  (*See id.* at ¶ 5(a).)

Under paragraph nine of the License Agreement, entitled "Use of Premises," Plaintiff was authorized to use its designated space on Defendant's tower and in a nearby equipment shelter "for the installation, operation, and maintenance of Antennae Facilities . . . , and for no other purpose."  (*Id.* at ¶ 9(a).)[3]  Plaintiff was permitted under this provision to "erect and operate one FMEC/1 antenna," and to "expand but only with [Defendant's] consent and only after [Defendant] ha[d] obtained, at [Plaintiff's] expense, a certified evaluation indicating that each additional antenna will not interfere with existing antennae or proposed antennae, and the Tower can structurally support the additional antennae."  (*Id.* at ¶ 9(a).)

Another provision in the License Agreement also addressed the parameters and procedures for Plaintiff to upgrade its broadcast equipment, stating in relevant part:

---

[3]The Agreement defined "Antennae Facilities" as "directional antennae, connecting cables and appurtenances."  (*Id.* at ¶ 1(a).)

Licensee may update or replace the Antennae Facilities from time to time with the prior written approval of [Defendant], provided that the replacement facilities are not greater in number or size or power output than the existing facilities and that any change in their location on the Tower is satisfactory to [Defendant]. [Plaintiff] shall submit to [Defendant] a detailed proposal for any such replacement facilities and any supplemental materials as may be requested, for [Defendant's] evaluation and approval.

(*Id.* at ¶ 11.) In addition, a provision in paragraph sixteen of the Agreement granted to Defendant or its "designated representative(s)" the "sole right initially and during the Term of this License Agreement to . . . approve any changes to the size, type and quality of [Plaintiff's] Equipment, . . . and any repairs or replacements thereto, which approval shall not be unreasonably withheld." (*Id.* at ¶ 16(a)(2).)

In the event of a dispute under the License Agreement, the parties were required to meet "promptly . . . to attempt in good faith to negotiate a resolution of the dispute." (*Id.* at ¶ 45(b).) The Agreement further provided that "[i]f within twenty (20) days after such meeting the parties have not succeeded in resolving the dispute, they will, within twenty (20) days thereafter[,] submit the dispute to a mutually acceptable third party mediator who is acquainted with dispute resolution methods." (*Id.*) Although the parties agreed to "participate in good faith" in the mediation process, the mediation was deemed "nonbinding." (*Id.*)

6

The License Agreement included an "Entire Agreement" clause providing that the Agreement "constitutes the entire understanding between the parties hereto and shall supersede all prior offers, negotiations and agreements between the parties relative to the subject matter herein." (*Id.* at ¶ 46.) In addition, the parties agreed that "[t]his License Agreement may not be changed, modified, amended or altered except by an agreement in writing and signed by all of the parties to [the] change, modifications, amendment or alteration." (*Id.* at ¶ 51.) As to the issue of waiver, the License Agreement provided (i) that the "[f]ailure of [Defendant] to insist on strict performance of any of the conditions, covenants, terms or provisions of this Agreement or to exercise any of its rights hereunder shall not waive such rights," (*id.* at ¶ 43), and (ii) that "[n]o modification or waiver of any of the terms hereof shall be valid unless in writing and signed by the parties hereto," (*id.* at ¶ 52). Finally, the parties stipulated that the License Agreement "shall be construed in accordance with, and subject to, the laws of the State of Michigan." (*Id.* at ¶ 48.)

## C.   Defendant's Denial of Plaintiff's Request to Upgrade Its Broadcasting Equipment

In April of 2011, Plaintiff applied to the FCC for a permit to upgrade its broadcasting equipment on Defendant's tower and increase the wattage of its

broadcast signal to 50,000 watts, and the FCC issued the requested permit on August 31, 2012. During this same time period, representatives of Plaintiff and the Defendant City began discussions about modifying Plaintiff's equipment on the City's tower to carry out the upgrade authorized by the FCC.

In connection with Plaintiff's request to upgrade its equipment, the City sought the opinion of Russell Harbaugh, an electrical engineer who specializes in radio frequency engineering. In a report dated September 23, 2013, Mr. Harbaugh identified four issues that Defendant should consider as it decided whether to approve Plaintiff's proposed equipment upgrade: (i) that measurements would be required upon completion of the upgrade to determine the extent of the increased radio frequency radiation ("RFR") exposure to workers and the general public, (ii) that the increased signal strength from Plaintiff's upgraded equipment might produce blanketing interference with other signals in the vicinity of the tower, resulting in complaints that the City might have to handle, (iii) that Plaintiff's upgraded equipment might interfere with the equipment of other tenants on the tower, and (iv) that in order to achieve a 50,000 watt signal, Plaintiff would need a larger antenna than indicated in its proposal, which would require more space on Defendant's tower and demand more power. (*See* Defendant's Motion, Ex. 14,

Harbaugh 9/23/2013 Report.)[4]

On November 12, 2013, a representative of the Defendant City, John Menna, sent a letter to Plaintiff's president, Ed Czelada, stating that Plaintiff's request to modify its broadcasting equipment had been denied.  (*See* Defendant's Motion, Ex. 15, 11/12/2013 Denial Letter.)  Mr. Menna explained in this letter that Defendant had denied Plaintiff's request "based on the heightened risk the project would pose to other tower tenants and the surrounding community in relationship to interference, health and safety issues." (*Id.*)  Mr. Menna further stated that the Defendant City "would be happy to work with you on a smaller scale improvement at the current tower site," or that Plaintiff could instead "pursue relocation of equipment to [a] new or another existing tower if your project is not approved at the current site." (*Id.*)

After this denial, the parties continued their discussions concerning Plaintiff's requested equipment upgrade.  In support of its proposed upgrade, Plaintiff provided the City with a report from Edward De La Hunt, a telecommunications engineering consultant and former FCC deputy chief of

---

[4]As noted by Plaintiff, Mr. Harbaugh testified at his deposition that the fourth concern raised in his report — *i.e.,* the need for a larger antenna — was no longer valid, once he determined the particular type of antenna that Plaintiff proposed to use.  (*See* Defendant's Motion, Ex. 12, Harbaugh Dep. at 59-60.)

9

engineering, opining that "[t]here appears to be no substantial evidence that [Plaintiff's] proposal would pose a health, safety or interference threat to tower workers, tenants or the general public." (Defendant's Motion, Ex. 17, De La Hunt 12/30/2014 Report at 11; *see also* Ex. 18, 2/11/2015 Letter from Plaintiff's counsel forwarding De La Hunt report.)  Following the parties' discussions and Defendant's review of Mr. De La Hunt's report, counsel for the City informed Plaintiff's counsel in an April 21, 2015 letter that the City had "affirm[ed] its decision to decline [Defendant's] request to change the equipment authorized on [the City's] tower at the time of contract execution."  (Plaintiff's Response, Ex. 13, 4/21/2015 Letter from Defendant's counsel at 2.)  Defendant's counsel explained that "[i]nsofar as [the City] owns the tower any decision as to customer, equipment and changes are solely its own," and that the City's decision to deny Plaintiff's request "best suits the City's interests in several aspects but primarily in minimizing safety, nuisance and technical risks."  (*Id.*)

At the request of Plaintiff's counsel, representatives of the parties met in August of 2015 to address their dispute concerning Plaintiff's requested equipment upgrade.  The parties failed to resolve their differences at this meeting, and this suit followed shortly thereafter.

10

# III.  ANALYSIS

## A.    The Standards Governing Defendant's Motion

Through its present motion, Defendant seeks an award of summary

judgment in its favor on Plaintiff's state-law breach of contract claim and its two

federal claims.  Under the Federal Rule governing this motion, summary judgment

is proper "if the movant shows that there is no genuine issue as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

As the Supreme Court has explained, "the plain language of Rule 56[] mandates

the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106

S. Ct. 2548, 2552 (1986).  The central issue under Rule 56 is "whether the

evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512

(1986).

In deciding a motion brought under Rule 56, the Court must view the

evidence "in a light most favorable to the party opposing the motion, giving that

party the benefit of all reasonable inferences." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007). Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party." *Smith Wholesale,* 477 F.3d at 861 (internal quotation marks and citation omitted).

**B.    Defendant Did Not Breach the License Agreement by Denying Plaintiff's Request to Upgrade Its Broadcasting Equipment in a Manner That Would Have Increased the Number, Size, and Power Output of Plaintiff's Antennae Facilities.**

In Count III of its amended complaint, Plaintiff has asserted a state-law breach of contract claim, alleging that Defendant breached the parties' License

Agreement when it denied Plaintiff's request to upgrade its broadcasting equipment and increase the strength of its broadcast signal to 50,000 watts. Defendant now seeks summary judgment in its favor on this claim, arguing that its denial of Plaintiff's request rested upon the proper exercise of a right expressly granted to the City under the License Agreement. As discussed below, the Court agrees.

The Court's analysis of Plaintiff's breach of contract claim necessarily begins with the language of the License Agreement itself, and this inquiry is guided by certain basic tenets of Michigan contract law.[5] "The primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v. Chrysler Corp.,* 445 Mich. 109, 517 N.W.2d 19, 29 n.28 (1994). Where possible, this intent must be ascertained through "the words used in the instrument," as the Court "does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." *Sheldon-Seatz, Inc. v. Coles*, 319 Mich. 401, 29 N.W.2d 832, 834-35 (1947)

---

[5]As noted earlier, the License Agreement itself expressly provides that it "shall be construed in accordance with . . . the laws of the State of Michigan," (License Agreement at ¶ 48), and the parties likewise agree that Michigan law governs the interpretation of the Agreement.

(internal quotations and citation omitted).  Similarly, the Michigan Supreme Court has emphasized that a court is not at liberty to disregard the unambiguous terms of a contract on the ground that this plain meaning would defy the supposed "reasonable expectations" of the parties.  *Wilkie v. Auto-Owners Insurance Co.,* 469 Mich. 41, 664 N.W.2d 776, 782 (2003).  Finally, the Court must "construe [the License Agreement] as a whole and give harmonious effect, if possible, to each word and phrase."  *Singer v. Goff,* 334 Mich. 163, 54 N.W.2d 290, 292 (1952).

In arguing that it acted in accordance with the License Agreement when it denied Plaintiff's request to upgrade its broadcasting equipment, Defendant relies principally on paragraph eleven of the Agreement, which provides in pertinent part:

> [Plaintiff] may update or replace the Antennae Facilities from time to time with the prior written approval of [Defendant], ***provided that the replacement facilities are not greater in number or size or power output than the existing facilities*** and that any change in their location on the Tower is satisfactory to [Defendant].  [Plaintiff] shall submit to [Defendant] a detailed proposal for any such replacement facilities and any supplemental materials as may be requested, for [Defendant's] evaluation and approval.

(License Agreement at ¶ 11 (emphasis added).)  While Defendant acknowledges that other provisions in the License Agreement address the process for approving

14

any proposed changes to Plaintiff's equipment on the City's telecommunications tower, it contends that none of these other terms supersede the limitations imposed under paragraph eleven.  Because it is undisputed that Plaintiff's proposed upgrade would have entailed (i) the addition of three antennas to the one currently installed on the City's tower, and (ii) an increase in the strength of Plaintiff's broadcast signal from its current 700 watts to 50,000 watts, Defendant argues that paragraph eleven of the License Agreement expressly granted it the authority to refuse Plaintiff's requested upgrade to antennae facilities that were greater in both number and power output than Plaintiff's existing facilities.

Plaintiff suggests two grounds for avoiding this result, but neither carries the day.  First, Plaintiff contends that the License Agreement is rendered ambiguous by its multiple, allegedly conflicting provisions addressing the issue of equipment upgrades.  In particular, apart from the above-quoted language in paragraph eleven, another provision of the Agreement grants to Defendant or its "designated representative(s)" the "sole right initially and during the Term of this License Agreement to . . . approve any changes to the size, type and quality of [Plaintiff's] Equipment, . . . and any repairs or replacements thereto, which approval shall not be unreasonably withheld."  (*Id.* at ¶ 16(a)(2).)  Plaintiff also points to language in paragraph nine authorizing it to "erect and operate one

FMEC/1 antenna," and to "expand but only with [Defendant's] consent and only after [Defendant] has obtained, at [Plaintiff's] expense, a certified evaluation indicating that each additional antenna will not interfere with existing antennae or proposed antennae, and the Tower can structurally support the additional antennae." (*Id.* at ¶ 9(a).)

In Plaintiff's view, this language in paragraphs nine and sixteen of the License Agreement cannot be reconciled with a reading of paragraph eleven as flatly prohibiting upgraded facilities that reflect an increase in number, size, or power output over Plaintiff's existing antennae facilities. Plaintiff reasons that the right of expansion conferred in paragraph nine would be rendered illusory if any such expansion were subject to paragraph eleven's prohibition against increases in the number, size, or power output of Plaintiff's antennae facilities. Plaintiff further contends that Defendant's proposed reading of paragraph eleven cannot be squared with the language in paragraph sixteen mandating that Defendant may not "unreasonably withh[o]ld" its approval of proposed "changes to the size, type, and quality of [Plaintiff's] Equipment." (*Id.* at ¶ 16(a)(2).)

While the Court recognizes the force of Plaintiff's argument on this point, it cannot accept Plaintiff's conclusion that there are ambiguities in the License Agreement that a trier of fact must resolve. The provisions cited by Plaintiff,

16

while overlapping and perhaps somewhat in tension with one another when considered in isolation, may be reconciled by resort to the mandate of Michigan law that the License Agreement must be construed as a whole. *See Singer,* 54 N.W.2d at 292. Whether under paragraph nine or sixteen, Plaintiff is expressly required to secure Defendant's "consent," (*id.* at ¶ 9(a)), or "approv[al]," (*id.* at ¶ 16(a)(2)), before it may upgrade its broadcasting equipment. Viewed against this backdrop, paragraph eleven qualifies Defendant's right of approval, and alerts Plaintiff that this requisite consent will not be forthcoming if Plaintiff's proposed replacement facilities are "greater in number or size or power output than [its] existing facilities." (*Id.* at ¶ 11.) While this surely limits the changes or expansions that would be available to Plaintiff under a License Agreement that lacked the restrictive language of paragraph eleven, the Court cannot say that the opportunities for modification referenced in paragraphs nine and sixteen —subject, as explained, to Defendant's approval — are rendered wholly illusory in light of this restrictive language.

Defendant's reading of the License Agreement finds further support in the principle that specific contract provisions ordinarily govern over more general ones. *See Royal Property Group, LLC v. Prime Insurance Syndicate, Inc.,* 267 Mich. App. 708, 706 N.W.2d 426, 434 (2005). While paragraph nine references

17

certain criteria Defendant will consider in determining whether to grant a request for an expansion, and paragraph sixteen states more generally that Defendant's approval of a requested change will not be "unreasonably withheld," paragraph eleven specifically identifies the types of upgrades that Defendant will not approve — namely, those that entail replacement facilities that are "greater in number or size or power output" than Plaintiff's existing facilities. Indeed, if the Court were to accept Plaintiff's claim of ambiguity, this would open the door for a trier of fact to conclude that Defendant's assessment of Plaintiff's proposed upgrade should be governed by the criteria listed in paragraph nine or the general standard of "reasonableness" set forth in paragraph sixteen, rather than the more specific language of paragraph eleven. This would not only elevate general contract provisions over a more specific one, but would create the precise dilemma that Plaintiff has identified in support of its claim of ambiguity — namely, it would render illusory the language in paragraph eleven that expressly limits the types of equipment upgrades that Defendant will approve. Accordingly, the Court rejects Plaintiff's contention that the terms of the License Agreement give rise to one or more ambiguities that a trier of fact must resolve.[6]

---

[6]In light of this conclusion that the relevant terms of the License Agreement are not ambiguous, the Court need not address the extrinsic evidence produced by Plaintiff to illustrate these purported ambiguities and shed light on the alleged intentions of the

Next, Plaintiff contends that Defendant waived its right to invoke paragraph eleven of the License Agreement through its consistent failure to reference this provision when stating its reasons for denying Plaintiff's request to upgrade its broadcasting equipment.  As Plaintiff observes, Defendant's initial November 12, 2013 denial letter explained that Plaintiff's proposed upgrade posed a "heightened risk . . . to other tower tenants and the surrounding community in relationship to interference, health and safety issues."  (Defendant's Motion, Ex. 15, 11/12/2013 Denial Letter.)  Similarly, the April 21, 2015 letter from Defendant's counsel affirming this denial stated that this decision "best suits the City's interests in several aspects but primarily in minimizing safety, nuisance and technical risks." (Plaintiff's Response, Ex. 13, 4/21/2015 Letter at 2.)  In Plaintiff's view, Defendant's stated reliance on an increased risk of interference and health, safety, and technical concerns operated as a waiver of any right conferred under paragraph eleven of the License Agreement to deny any equipment upgrade that entailed more antennas or an increase in size or power output.

As Defendant points out in response, however, Plaintiff's claim of waiver cannot withstand scrutiny under the governing Michigan law.  The leading Michigan case on this subject is *Quality Products & Concepts Co. v. Nagel*

contracting parties.

19

*Precision, Inc.,* 469 Mich. 362, 666 N.W.2d 251, 254 (2003), in which the parties entered into a written contract calling for the plaintiff to serve as a sales representative for the defendant.  Although the contract expressly excluded the payment of commissions for sales to machine tool suppliers, and also included clauses requiring that contract modifications be made in writing and providing that delays, omissions, or failures by the defendant in exercising its contractual rights did not constitute a waiver of those rights, the plaintiff nonetheless cited the defendant's course of conduct as reflecting its implied consent to modify the parties' agreement and pay commissions for sales to machine tool suppliers.  *See Quality Products,* 666 N.W.2d at 254-55, 259.

At the threshold of its analysis, the court recognized that there is a "tension between the freedom to enter into a contract concerning the same subject matter as a previous contract and provisions in the previous contract restricting the manner in which original contract terms may be modified or waived."  666 N.W.2d at 257.  Because contracting parties "never cease to possess[] the freedom to contract[,] even after the original contract has been executed," the court found that "contracts with written modification or anti-waiver clauses can be modified or waived notwithstanding their restrictive amendment clauses."  666 N.W.2d at 257.  The court emphasized, however, that "the freedom to contract does not authorize a

20

party to *unilaterally* alter an existing bilateral agreement," and that "a party alleging waiver or modification must [therefore] establish a mutual intention of the parties to waive or modify the original contract."  666 N.W.2d at 257-58 (emphasis in original).

The court next explained that this requisite showing of mutual intention to modify a contract or waive one of its terms is subject to a heightened standard of proof:

> The mutuality requirement is satisfied where a modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to waive the terms of the original contract.  In meeting this clear and convincing burden, a party advancing amendment must establish that the parties mutually intended to modify the *particular* original contract, including its restrictive amendment clauses such as written modification or anti-waiver clauses.

666 N.W.2d at 258 (emphasis in original).  In addition, where a party "relies on a course of conduct to establish modification," the court held that this conduct must demonstrate "by clear and convincing evidence that a contracting party, relying on the terms of the prior contract, knowingly waived enforcement of those terms."  666 N.W.2d at 258.  Finally, in cases where the parties' original contract includes written modification or anti-waiver clauses that reflect the parties' *"express mutual statement"* as to the manner in which the terms of this contract may be

21

amended or waived, the court emphasized that "[a]ny clear and convincing evidence of conduct must overcome not only the substantive portions of the previous contract allegedly amended, but also the parties' express statements regarding the ground rules for modification or waiver as reflected in any restrictive amendment clauses." 666 N.W.2d at 259.

Applying these standards to the case before it, the court found that the plaintiff had not shown by clear and convincing evidence that the parties mutually intended to modify their agreement for the payment of sales commissions:

> Plaintiff's proofs rest on the mere fact that defendant knew about plaintiff's activity inconsistent with the contract and remained silent. Plaintiff has submitted no evidence of representations or affirmative conduct by defendant that it was intentionally and voluntarily relinquishing its right to confine the parties' relationship to the terms of the contract and thus demand strict adherence to the sales-commissions and sales-territory provisions in the contract. Plaintiff has forwarded no evidence that defendant affirmatively accepted plaintiff's sales activity that was inconsistent with the contract as a modification of the contract.

> Defendant's mere silence, regardless whether defendant possessed knowledge of plaintiff's sales activity outside the contract, does not here amount to an intentional relinquishment of the sales-territory and sales-commissions limitations in the contract or the contract's restrictive amendment clauses . . . . Accordingly, plaintiff has failed to establish waiver of the original contract by any evidence, much less clear and convincing evidence.

666 N.W.2d at 260.

The principles articulated in *Quality Products* lead to the same conclusion here. Plaintiff has not produced any evidence, let alone clear and convincing evidence, of representations or affirmative conduct by Defendant indicating that it was intentionally and voluntarily relinquishing its right under paragraph eleven of the License Agreement to deny any request for an equipment upgrade that entailed replacement facilities greater in number, size, or power output than Plaintiff's existing facilities. Nor has Plaintiff produced evidence of representations or a course of conduct reflecting Defendant's willingness to forgo the Agreement's ground rules regarding modification and waiver — *i.e.,* its provisions (i) mandating that any modification must be made in writing and signed by all parties, (*see* License Agreement at ¶ 51),[7] and (ii) stating that Defendant's failure to insist on strict performance of the terms of the Agreement or to exercise any of its rights under the Agreement did not operate as a waiver, (*id.* at ¶ 43).

Rather, Plaintiff relies solely on Defendant's willingness to consider and discuss Plaintiff's proposed equipment upgrade over the course of several months, even after it was apparent that this proposal would entail the replacement of

---

[7]Notably, Plaintiff points out that the parties agreed in a written addendum to modify a paragraph of the License Agreement that set forth Plaintiff's obligation to pay rent for its use of the City's tower. (*See* Plaintiff's Response, Ex. 9, First Addendum.) This presumably evidences the parties' mutual understanding that the License Agreement could be modified only in writing.

23

Plaintiff's existing broadcast facilities with equipment that included more antennas and produced a far stronger broadcast signal. As Plaintiff correctly observes, there is no evidence that Defendant or its representatives ever invoked paragraph eleven of the License Agreement as a basis for denying Plaintiff's proposed upgrade, whether during the parties' discussions or in the letters informing Plaintiff that its requested upgrade had been denied.

Nonetheless, under *Quality Products,* 666 N.W.2d at 260, a finding of waiver cannot rest upon the mere fact that Defendant remained silent despite its knowledge that Plaintiff's proposed upgrade was inconsistent with the terms of paragraph eleven of the Agreement. This is particularly so where, as here and in *Quality Products,* the parties' agreement includes "written modification" and "anti-waiver" clauses that restrict the manner in which the parties' contractual rights and obligations may be altered. Because the evidence produced by Plaintiff shows nothing more than Defendant's knowing silence in the face of Plaintiff's effort to upgrade its broadcast equipment beyond the parameters established in the License Agreement, the Court finds no basis for concluding that Defendant waived its right under the Agreement to deny this requested upgrade. It follows as a matter of law that Plaintiff cannot go forward with its claim that Defendant breached the parties' License Agreement by refusing to allow this requested

24

upgrade.

Finally, apart from alleging that Defendant breached the License Agreement by denying Plaintiff's request for an equipment upgrade, Plaintiff also asserts that Defendant breached a different provision of the Agreement that establishes procedures for the resolution of disputes. In particular, the License Agreement mandates that the parties engage in a "mediation process" in the event of a dispute "arising out of this [Agreement] or breach thereof," (License Agreement at ¶ 45(a)), and the first step in this process is a "meeting [to] be held promptly between the parties to attempt in good faith to negotiate a resolution of the dispute," (*id.* at ¶ 45(b)). According to Plaintiff, while its counsel requested meetings in correspondence dated February 11, June 17, and July 16, 2015, this meeting did not occur until August 21, 2015, and Plaintiff contends that this "delay of six months" constituted a breach of Defendant's obligation under paragraph 45(b) of the License Agreement to meet "promptly" after a dispute arises. (*See* Plaintiff's Response Br. at 6-7.)

As a threshold matter, the record fails to support Plaintiff's claim of a six-month delay before Defendant agreed to meet with Plaintiff to discuss the parties' dispute. Although Plaintiff, through its then-attorney Mark J. Makoski, sent a February 11, 2015 letter requesting a "brief meeting" between himself and

25

Defendant's representatives, Mr. Makoski enclosed an expert report from Edward

De La Hunt with this letter and asked Defendant to "review the report" prior to the

requested meeting. (*See* Defendant's Motion, Ex. 18, Makoski 2/11/2015 Letter.)

In a response dated April 21, 2015, counsel for the Defendant City stated that Mr.

De La Hunt's report "included no new or additional information that would impact

[Defendant's] decision-making," and he informed Mr. Makoski that the City had

"affirm[ed] its decision to decline" Plaintiff's request to upgrade its broadcasting

equipment. (Plaintiff's Response, Ex. 13, 4/21/2015 Letter from Defendant's

counsel at 2.)

So far as the record discloses, Plaintiff took no immediate action upon

receiving this April 21, 2015 letter affirming the denial of its requested upgrade.

Rather, in a letter dated June 17, 2015, Plaintiff's counsel in this suit, Cindy

Rhodes Victor, informed Defendant that she had been retained to represent

Plaintiff, and she took issue with various aspects of Defendant's decision and

requested a meeting within ten days "to discuss reconsideration of" this decision.

(Plaintiff's Response, Ex. 15, 6/17/2015 Letter from Plaintiff's counsel.)

Although there evidently was no immediate face-to-face meeting as a result of this

June 17 letter, Plaintiff's counsel stated in a subsequent July 16, 2015 letter that

she had participated in a "telephone conference" with Defendant's counsel, who

"requested the legal authority on which [she] relied" in her June 17 letter.
(Plaintiff's Response, Ex. 16, 7/16/2015 Letter from Plaintiff's counsel.)  The
parties then held a meeting on August 21, 2015 to discuss a possible resolution of
their dispute.

Under this record, the Court cannot say that Defendant breached its duty to
meet "promptly" following the parties' dispute.  This duty presumably arose, at the
earliest, when Plaintiff's counsel sent her June 17, 2015 letter stating that she had
been retained by Plaintiff, challenging the grounds for Defendant's decision, and
requesting that the parties meet to discuss this decision.  The parties' counsel then
participated in a telephone conference at some point between June 17 and July 16,
when Plaintiff's counsel sent another letter to Defendant and again requested a
meeting.  Even assuming this telephone conference between counsel did not
qualify as the requisite "meeting" called for under paragraph 45(b) of the License
Agreement, there was roughly a two-month delay between Plaintiff's counsel's
June 17, 2015 letter and the parties' August 21, 2015 meeting.  This is not
suggestive of a breach of the parties' obligation to meet "promptly" in an effort to
resolve their dispute, particularly given the correspondence exchanged between
the parties and the telephone conference held during this two-month period.

In any event, Plaintiff fails to suggest what relief would be appropriate to

address Defendant's alleged breach of the "prompt meeting" obligation imposed on the parties under paragraph 45(b) of the License Agreement.  In its amended complaint, Plaintiff seeks (i) an order enjoining the Defendant City and its representatives from taking any action to prevent Plaintiff from implementing its proposed upgrade of its broadcasting equipment, and (ii) an award of damages to compensate Plaintiff for the losses it has suffered as a result of Defendant's denial of this requested upgrade.  Even assuming that Defendant failed to comply with one or more aspects of the dispute resolution process set forth in paragraph 45 of the License Agreement, neither form of relief sought by Plaintiff here could be deemed an appropriate remedy for any such breach.  Rather, the proper remedy presumably would be an order directing the parties to pursue to completion the dispute resolution process called for under their Agreement.  Yet, Plaintiff has requested no such relief; to the contrary, it abandoned this dispute resolution process by commencing this suit.[8]  Accordingly, the Court finds that Plaintiff has failed to identify a basis for awarding relief arising from Defendant's alleged breach of the "prompt meeting" obligation set forth in paragraph 45(b) of the

---

[8]As Defendant suggests in the brief in support of its motion, (*see* Defendant's Motion, Br. in Support at 13-14), it could well be argued that Plaintiff waived its right to insist upon this contractual dispute resolution process when it chose to pursue judicial remedies rather than the nonbinding mediation called for in the License Agreement.

28

License Agreement.

**C.     Plaintiff Has Failed to State a Viable Claim for Relief Under the Federal Telecommunications Act or Its Implementing Regulations.**

In Count II of its amended complaint, Plaintiff has asserted a claim under the federal Telecommunications Act ("TCA"), 47 U.S.C. § 151 *et seq.,* and its implementing regulations, alleging that the Defendant City's denial of its request to upgrade its broadcasting equipment ran afoul of the exclusive authority of the Federal Communications Commission ("FCC") to regulate the matters cited by the City as the grounds for this denial.  In seeking summary judgment in its favor on this claim, Defendant contends (i) that no private cause of action is available to Plaintiff to challenge Defendant's alleged violation of the TCA or the relevant FCC regulations, and (ii) that even if such a cause of action exists, the Defendant City acted as an ordinary property owner, and thus was not subject to the TCA or the FCC regulations, when it entered into the License Agreement with Plaintiff and invoked the terms of this Agreement to deny Plaintiff's request to upgrade its broadcasting equipment.  The Court is persuaded by the second of these arguments, and therefore need not address the first.

As the legal basis for its claim under the TCA, Plaintiff cites a provision in this enactment stating that "[n]o State or local statute or regulation, or other State

or local legal requirement, may prohibit or have the effect of prohibiting the ability

of any entity to provide any interstate or intrastate telecommunications service."

47 U.S.C. § 253(a).  Although this statute preserves the rights of states and local

governments to engage in certain forms of regulation, *see* § 253(b), (c), it

authorizes the FCC to "preempt the enforcement of [a state or local] statute,

regulation, or legal requirement" that violates this TCA provision "to the extent

necessary to correct such violation or inconsistency," § 253(d).  As Plaintiff

observes, the Sixth Circuit has held that § 253 confers an implied right of action,

at least under some circumstances.  *See TCG Detroit v. City of Dearborn,* 206 F.3d

618, 622-24 (6th Cir. 2000).

Even assuming, however, that such a private right of action is available to

Plaintiff in this case, Defendant correctly observes that this claim must rest upon

an action by the City that may properly be characterized as a "regulation" within

the meaning of the TCA.  In arguing that this prerequisite to a viable TCA claim is

lacking here, Defendant points to the Second Circuit's ruling in *Sprint Spectrum*

*L.P. v. Mills,* 283 F.3d 404, 417-21 (2d Cir. 2002), as recognizing an important

distinction between a local government's regulatory and proprietary actions.

While the Court acknowledges that *Sprint Spectrum* is not binding here, it

nonetheless elects to follow this decision, particularly in the absence of any basis

for believing that the law of this Circuit warrants a different outcome.

In *Sprint Spectrum,* 283 F.3d at 407-08, the plaintiff telecommunications provider, Sprint, entered into a lease with the defendant school district that authorized Sprint to place a cellular telephone antenna on the roof of the district's high school, and the parties later agreed to amend the lease to establish maximum levels for the radio frequency ("RF") emissions generated by Sprint's equipment. Due to changes in available equipment, Sprint subsequently sought to modify its original installation plan, and one of its proposed changes would have increased the levels of RF emissions above the maximum levels authorized under the parties' lease, "although the levels nonetheless would remain in compliance with federal safety standards." 283 F.3d at 410. The school district refused to allow this modification, even after Sprint pointed out that the maximum levels stated in the parties' lease were "13,000 times below the maximum levels set by the applicable federal safety standards," and despite Sprint's assertion that "technological advances had made Sprint's originally planned equipment obsolete." 283 F.3d at 410. In light of this refusal, Sprint sought a court order compelling the school district to allow it to install its proposed antenna.

Although the Second Circuit recognized under its precedents — including a case upon which Plaintiff heavily relies here, *Freeman v. Burlington*

31

*Broadcasters, Inc.,* 204 F.3d 311 (2d Cir. 2000) — that the TCA grants fairly

broad preemptive authority to the FCC with regard to state and local regulation of

wireless service facilities, the court emphasized that "[n]ot all actions by state or

local government entities . . . constitute regulation, for such an entity, like a

private person, may buy and sale or own and manage property in the marketplace."

*Sprint Spectrum,* 283 F.3d at 416-17.  In addition, the court found that "the

language and structure of the TCA implicitly recognize that some governmental

decisions are not regulatory," and thus are not within the ambit of TCA

preemption.  283 F.3d at 420.

Applying these principles to the case before it, the court held that the

defendant school district's enforcement of the RF emissions limits in its lease with

Sprint did not constitute "regulation" governed by the TCA:

> . . . [W]e view the actions of the School District in entering into
> the Lease agreement as plainly proprietary.  There is no state or local
> statute or ordinance or guideline with respect to the RF Emissions
> levels at issue here.  The School District entered into a single lease
> agreement with respect to a single building.  The District did not
> purport to punish Sprint for any past conduct or to impose any
> condition with respect to any Sprint tower other than that to be
> located on the High School . . . .  We see in this record no basis for an
> inference that the School District sought to establish any general
> municipal policy.
>
> . . . [A] private individual, if approached by Sprint for
> permission to erect a cellular tower on his private property, would

32

plainly have the right simply to refuse to enter into such a contract. The School District has the same right in its proprietary capacity as property owner to refuse to lease the High School roof for the construction of such a facility . . . .

Further, a private party who has the right to refuse outright to lease his property also has the right to decline to lease the property except on agreed conditions (assuming those conditions would not violate law or public policy). Since, so far as we are aware, nothing in the law requires a communications company to operate at the FCC Guidelines maximum permissible radiation exposure levels, the private owner could elect not to grant a communications company a lease for the construction and operation of a cellular tower unless the company agreed to limit its RF emissions to a lower level. To the same extent, the School District as a public entity, sought out by the company only in the District's capacity as property owner, is permitted to do the same. And if the property owner, public or private, declines to enter into a lease without such a condition, the communications company is faced with a choice: the company may agree to the requested condition, or, if it is unwilling to do so, it may seek a lease elsewhere from a property owner who does not insist on such a condition. There is nothing in the conduct of the School District here that prevents Sprint from negotiating a lease on other property whose owner does not request conditions on emissions.

Finally, a lessee who agreed to the lease conditions requested by the owner of private property could not thereafter compel performance of the lease agreement by the private owner while the lessee refused to perform the agreed conditions. We see no indication that Congress meant the TCA to apply any different set of principles to a telecommunications company's negotiated agreement with a public property owner.

In sum, we conclude that the Telecommunications Act does not preempt nonregulatory decisions of a local governmental entity or instrumentality acting in its proprietary capacity; that the School District acted in a proprietary capacity, not a regulatory capacity, in

33

entering into the Lease agreement with Sprint; that the conditions to which Sprint agreed at the request of the District are conditions that a private property owner would be free to demand; and that such a private owner would not be compelled to perform obligations imposed on him by the contract if the communications company refused to perform the conditions agreed to by it in the contract. Accordingly, the School District's attempt to enforce the RF Emissions provisions in the Lease agreement, as the District interprets those provisions, is not preempted by the Telecommunications Act.

283 F.3d at 420-21.

The material facts of this case are indistinguishable from those presented in *Sprint Spectrum,* and the Court is persuaded that the Second Circuit's analysis should apply with full force here. Like the school district in *Sprint Spectrum,* Defendant here plainly acted in a proprietary rather than regulatory capacity when it entered into the License Agreement with Plaintiff. This Agreement concerned a single telecommunications tower owned by the Defendant City, and granted space on this tower to a single tenant, subject to various conditions. Nothing in the circumstances surrounding the negotiation and execution of the License Agreement suggests that Defendant meant to establish municipal policy through this transaction, as opposed to setting the terms of a single landlord/tenant relationship. As explained by the Second Circuit, just as a private party who owned the telecommunications tower could elect to lease space on this tower only if the lessee agreed to certain conditions, the Defendant City could insist upon

34

similar conditions in its License Agreement with Plaintiff without thereby
engaging in governmental "regulation" within the meaning of the TCA.

Finally, it is noteworthy that Plaintiff does not even address *Sprint Spectrum*
in its response to Defendant's motion, much less attempt to distinguish it.
Accordingly, just as the Second Circuit determined in *Sprint Spectrum* that the
defendant school district could enforce the terms of its lease with Sprint without
running afoul of TCA preemption, this Court likewise finds that Defendant's
enforcement of paragraph 11 of the License Agreement to deny Plaintiff's request
to upgrade its broadcasting equipment does not give rise to a viable claim under
the TCA or its implementing regulations.

**D.     The Record Fails as a Matter of Law to Establish a Violation of
         Plaintiff's Federal Constitutional Rights to Due Process or Equal
         Protection of the Laws.**

Turning, finally, to the federal 42 U.S.C. § 1983 claims asserted in Count II
of Plaintiff's amended complaint, Plaintiff alleges in support of these claims that
the Defendant City's denial of its request to upgrade its broadcasting equipment
violated its rights to due process and equal protection of the laws as guaranteed by
the Fourteenth Amendment to the U.S. Constitution.  The Court finds it
unnecessary to engage in a lengthy analysis of these claims, because it agrees with
Defendant that the proper disposition of these claims is largely governed by the

35

Court's rulings on Plaintiff's breach of contract claim.

As Defendant observes, Plaintiff's claim of a due process violation cannot succeed absent a showing, among other elements, that Plaintiff possessed a constitutionally protected property interest.  *See Thomas v. Cohen,* 304 F.3d 563, 576 (6th Cir. 2002).  In this case, Plaintiff attempts to establish the requisite property interest by pointing to the language in paragraph 16(a) of the License Agreement that (i) grants Defendant or its designated representative to right to "approve any changes to the size, type and quality of [Plaintiff's] Equipment," but (ii) dictates that this "approval shall not be unreasonably withheld."  (License Agreement at ¶ 16(a).)  Plaintiff contends that Defendant unreasonably withheld its approval of Plaintiff's proposed equipment upgrade "for no reason at all, or simply because it wanted to deny the request," and thereby deprived Plaintiff of a "legitimate claim of entitlement," conferred under the License Agreement, to expect that the Defendant City would reasonably exercise its purportedly limited discretion in evaluating Plaintiff's proposed upgrade.  (Plaintiff's Response Br. at 27.)

As discussed earlier, however, the above-quoted provision of the License Agreement must be construed in light of the more specific language in paragraph 11 stating that Plaintiff may update its antennae facilities with Defendant's "prior

36

written approval," provided that "the replacement facilities are not greater in number or size or power output than [Plaintiff's] existing facilities." (License Agreement at ¶ 11.) Because Plaintiff's requested upgrade fell squarely within this provision as a proposal to increase the number of antennas and the power output of Plaintiff's broadcasting facilities, the terms of the License Agreement preclude Plaintiff from claiming a legitimate entitlement to this upgrade. Thus, Plaintiff has failed to identify a constitutionally protected property interest that could support its due process claim.

As for Plaintiff's claim of an equal protection violation, Plaintiff does not contend that it is a member of a suspect class, nor does it claim that Defendant burdened a fundamental right. Rather, Plaintiff proceeds under a "class of one" theory, which entails a showing that it was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S. Ct. 1073, 1074 (2000); *see also Radvansky v. City of Olmsted Falls,* 395 F.3d 291, 312 (6th Cir. 2005). In support of this theory, Plaintiff points to evidence that two other tenants of the Defendant City's telecommunications tower, AT&T and T-Mobile, were permitted to expand their equipment on the tower in a manner that increased the number of antennas and the power output of their facilities. (*See* Plaintiff's

37

Response Br. at 29-30.)

Yet, while Plaintiff maintains that it is similarly situated to these two other tenants, the record does not disclose the contractual terms of the Defendant City's relationship with these tenants. There is no evidence, in particular, that Defendant entered into a contract with either AT&T or T-Mobile that permitted equipment upgrades only on the condition that replacement antennae facilities were "not greater in number or size or power output" than the company's existing facilities. Absent evidence that these other tenants faced contractual constraints similar to those imposed on Plaintiff under its License Agreement with the Defendant City, it cannot be said that Plaintiff and these other tenants were similarly situated and yet treated differently without any rational basis. This lack of evidence is fatal to Plaintiff's claim of an equal protection violation.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's June

10, 2016 motion for summary judgment (docket #18) is GRANTED.


s/Gerald E. Rosen_____
United States District Judge

Dated:  January 30, 2017

I hereby certify that a copy of the foregoing document was served upon the parties
and/or counsel of record on January 30, 2017, by electronic and/or ordinary mail.


s/Julie Owens_____
Case Manager, (313) 234-5135